UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**KENNETH SHEARD**                                                                     **PLAINTIFF**

v.                                                                         **NO. 3:20-cv-152-BJB**

**NOVO NORDISK, INC.**                                                   **DEFENDANT**

\* \* \* \* \*

**OPINION & ORDER**

      May a Kentucky employer fire someone for driving to work with a gun in the car? What if the employee didn't actually have a firearm, but the employer acts on the mistaken belief that he does? And does a taser count as a firearm?

      These are some of the questions raised in this unusual wrongful-termination lawsuit. Novo Nordisk fired Kenneth Sheard after he told his supervisor that he "[was] packing" during a conversation about increasingly dangerous streets. Novo cited a company policy that barred employees from keeping guns in their cars. But it turns out Sheard was "packing" a taser, not a traditional gun. Now he claims that his termination violated Kentucky laws and public policy protecting citizens' rights to keep arms in their cars.

      Novo moved to dismiss the suit because it reads the laws Sheard relies on to not protect any right to keep and bear tasers. Although Kentucky courts haven't yet confronted this question, several others have. And Novo appears to have the better reading of the statutory text and caselaw: a taser isn't a "firearm" under Kentucky law because it doesn't use gunpowder to discharge a projectile.

      But Kentucky law indisputably imposes civil liability on employers who prevent or attempt to prevent employees from possessing firearms in their cars. *See* KRS § 527.020. And that is indisputably what Novo—though factually mistaken—*tried* to do, costing Sheard his job in the process. Does a mistaken attempt create the same liability for employers that an actual violation of gun-ownership rights would? The briefs don't address this critical question. So the Court denies the motion to dismiss and asks the parties to consider this issue at summary judgment.

**I.**

      Novo Nordisk, a multinational pharmaceutical company, hired Sheard as a sales representative in April 2017. First Am. Compl. (DN 5) ¶ 7. In February 2018, his supervisor expressed concern for his physical safety and cautioned him to "be

1

careful with the homeless in the area." ¶¶ 8–9. "Don't worry," Sheard responded, "I am packing." ¶ 11. Sheard's supervisor told Sheard that his possession of a gun in his car violated company policy. ¶¶ 13–14. Shortly thereafter, without any investigation or other discipline, Novo fired Sheard for violating its policy prohibiting employees from keeping guns in their cars. ¶¶ 14–18.

So Sheard sued Novo, complaining that his termination violated Kentucky law protecting the rights of employees and citizens to possess firearms. Sheard's amended complaint lodges three claims against Novo—two statutory and one that rests on an alleged violation of public policy. "No person who is the owner, lessee, or occupant of real property shall prohibit any person," according to KRS § 237.106(1), "from possessing a firearm." And KRS § 527.020(8) states that "[n]o person … shall prohibit a person from keeping a loaded or unloaded firearm … or other deadly weapon in a vehicle." Sheard also claims his termination "constitute[d] a violation of public policy," a "breach of the covenant of good faith and fair dealing," and a violation of his "rights under the Kentucky and United States Constitutions," all of which give him "a cause of action for wrongful discharge … contrary to a fundamental and well-defined public policy as evidenced by existing law." FAC ¶¶ 29–33 (quoting *Boykins v. Housing Authority*, 842 S.W.2d 527, 529 (Ky. 1992)).

Novo filed a motion to dismiss the complaint, whose well-pled factual allegations the Court accepts as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). If the non-conclusory facts make out a plausible claim to relief, dismissal is inappropriate. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.

Sheard's first claim, asserting rights under KRS § 237.106, fails for a very simple reason. The law is geographically limited to cases in which someone prohibits a person from "possessing a firearm … in a vehicle *on the property*" of the employer. KRS § 237.106 (emphasis added).[1] Section 237.106 "protects an employee who keeps a firearm in his vehicle on the employer's property or who removes or handles the firearm for one of [several] reasons listed." *Holly v. UPS Supply Chain Sols. Inc.*, 163

---

[1] KRS § 237.106 provides:

> (1) No person, including but not limited to an employer, who is the owner, lessee, or occupant of real property shall prohibit any person who is legally entitled to possess a firearm from possessing a firearm, part of a firearm, ammunition, or ammunition component in a vehicle on the property.
>
> …
>
> (4) An employer that fires, disciplines, demotes, or otherwise punishes an employee who is lawfully exercising a right guaranteed by this section and who is engaging in conduct in compliance with this statute shall be liable in civil damages.

F. Supp. 3d 465, 471 (W.D. Ky. 2016). And "[i]t is 'only under these limited circumstances' that the employer is subject to liability for taking disciplinary action against the employee." *Id.* (quoting *Korb v. Voith Indus. Servs.,* No. 3:12-cv-222, 2012 WL 7062365, at *2 (W.D. Ky. Nov. 28, 2012)).

Sheard's complaint does not allege that Novo fired him because he had a firearm on his employer's property. In fact, his complaint says nothing about the location of his taser-containing car. And without that essential factual allegation connecting Novo's firing of Sheard with the presence of Sheard's vehicle on the employer's property, the claim fails as a matter of law.

### III.

Sheard's second count alleges Novo violated KRS § 527.020(8), which bars any "person or organization" from "prohibit[ing] a person from keeping a loaded or unloaded firearm or ammunition, or both, or other deadly weapon in a vehicle" so long as that possession is in accordance with Kentucky law.

The law, though contained in the criminal code, goes on to expose those who attempt to prohibit guns in cars to potential civil liability. "Any *attempt* by a person or organization, public or private, to violate the provisions of this subsection may be the subject of an action for appropriate relief or for damages in a Circuit Court or District Court of competent jurisdiction." *Id.* (emphasis added). Kentucky's Supreme Court has given this language its plain meaning: an organization violates the statute when it prohibits an employee from possessing a firearm in his vehicle. *Mitchell v. Univ. of Ky.*, 366 S.W.3d 895, 899, 902 (Ky. 2012) (though the provision is "primarily a criminal statute" that is "codified in the penal code," it "specifically contemplate[s] and authorize[s] a *civil cause of action*"). Unlike KRS § 237.106, this provision is not geographically limited to cars *on an employer's property*. And it protects not only firearms, but also "other deadly weapon[s]." KRS § 527.020(8).

**A. Firearms.** Does a taser count as a "firearm" or "other deadly weapon"? The United States Supreme Court has recognized that the tasers are "arms" that fall within the Second Amendment's scope. *See Caetano v. Massachusetts*, 577 U.S. 411 (2016). But the question facing this Court, which the Kentucky Supreme Court hasn't addressed, is textually and analytically distinct: whether a taser is a *fire*arm or other deadly weapon under Kentucky law. In the absence of Kentucky caselaw on point, the *Erie* doctrine instructs this Court to look to the interpretive methods utilized by the state supreme court in interpreting state statutory language. *Faber v. Ciox Health, LLC*, 944 F.3d 593, 602 n.7 (6th Cir. 2019). The task is to "ascertain from all available data, including the decisional law of the state's lower courts, what the state's highest court would decide if faced with the issue." *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir. 2001).

As to the meaning of "firearm," the Kentucky Supreme Court would start, and could perhaps end, with its statutory definition. The General Assembly has defined "firearm" for purposes of Chapter 527 of the Kentucky penal code as "any weapon which will expel a projectile by the action of an explosive." KRS § 527.010(4); *see also* KRS § 237.060(2) (same definition). Indeed, a three-justice concurrence to a recent Kentucky Supreme Court decision expressly addressed "[t]he definition of 'firearm' in KRS 527.010(4)." *Commonwealth v. Jones*, 283 S.W.3d 665, 671 (Ky. 2009) (affirming a felon-in-possession conviction because a rifle's operability wasn't an element of the offense). Justice Venters's concurrence explained that § 527.010(4) distinguishes between "weapons … which expel a projectile by the action of an explosive i.e. gunpowder" and those "such as air rifles … that expel a projectile by some other means." *Id.*

This straightforward definition and distinction would probably suffice, standing alone, to refute Sheard's position that a taser is a firearm. Tasers, as the term is used colloquially and in the caselaw, do not use an "explosive" to expel a projectile. Rather, they "use[] compressed nitrogen to propel a pair of 'probes'—aluminum darts tipped with stainless steel barbs connected to the [taser] by insulated wires—toward the target," ultimately delivering an electric shock. *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir. 2012) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010)). Neither party's filings describe the taser at issue with any particularity, so it is possible that the facts of this case are ultimately incompatible with the description found in these precedents. But in general a taser's mechanics rely on compressed gas, not exploding gunpowder. That means it wouldn't be considered a *firearm* under KRS § 237.106 or § 527.020.

To the extent any doubt remains, other textual sources corroborate this understanding. Elsewhere the code expressly distinguishes between firearms and tasers. KRS § 16.220 tells state agencies how to use proceeds from the sale of confiscated firearms. Law enforcement agencies may use those proceeds to buy specified types of equipment, including "(b) Firearms or ammunition," and "(c) Electronic control devises, electronic control weapons, or electro-muscular disruption technology." KRS § 16.220. "[E]lectronic control weapons" would certainly include tasers, signaling they weren't already included within the reach of the neighboring "firearms" subsection. If Sheard were right that the definition of firearms included tasers, the legislature wouldn't have had any need to add a separate provision of surplusage speaking to the purchase of "electronic control weapons." In light of the consistent-usage canon, this definitional distinction in § 16.220 sheds light on § 527.020(8) as well. Kentucky caselaw encourages uniform interpretation of similar words or phrases across Kentucky statutes and precedents. *See Jefferson County Bd. of Educ. v. Fell*, 391 S.W.3d 713, 725 (Ky. 2012) (emphasizing "harmony and consistency" of usage across the statutory code and body of caselaw interpreting it).

4

The plain meaning of the statutory term "firearm" confirms this distinction. The Kentucky Supreme Court has encouraged courts to consider "dictionary definition[s]," *id.* at 725, in fixing "[t]he plain meaning of … statutory language," which "is presumed to be what the legislature intended," *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005) (quotation omitted); *see Johnson v. Branch Banking & Trust Co.*, 313 S.W.3d 557 (Ky. 2010); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 140 S. Ct. 2367, 2381 (2020). If a Kentucky statute's "meaning is plain, then the court cannot base its interpretation on any other method or source," unless the plain meaning "would produce an injustice or ridiculous result" (or "absurdity," discussed below). *O'Daniel*, 153 S.W.3d at 819 (quotation omitted).

Dictionaries confirm the meaning otherwise plain on the face of the statutes. *Webster's Second Dictionary*, considered by many to be "exhaustive on traditional legal and literacy terms," ANTONIN SCALIA & BRYAN GARNER, MAKING YOUR CASE: THE ART OF PERSUADING JUDGES 213 (2008), defines "firearm" as a "weapon from which a shot is discharged by an explosive as gunpowder," WEBSTER'S NEW INTERNATIONAL DICTIONARY 951 (2d ed. 1934; 1946) ("Webster's Second"); *see Revenue Cabinet v. Hubbard*, 37 S.W.3d 717 (2000) (Ky. 2000) (relying on *Webster's Second*). And *Black's* provides a similar definition of "firearm" as a "weapon that expels a projectile … by the combustion of gunpowder or other explosive…." BLACK'S LAW DICTIONARY 751 (10th ed. 2014); *see Smith v. Higgins*, 819 S.W.2d 710, 711 (Ky. 1991) (relying on *Black's*).

Uniform across these examples is a definitional limitation: Weapons that do not eject their projectiles by the combustion of gunpowder or other explosive are not "firearms" under Kentucky law. That excludes tasers. *See, e.g., Cockrell*, 468 F. App'x at 492.

**B. Absurdity.** Sheard offers little resistance to the linguistic and doctrinal distinction between firearms and tasers. Rather, he says this limited interpretation of "firearm" is absurd. Brief in Opp. (DN 8) at 4. Absurdity is an old, if limited, exception to the plain-meaning approach to statutory interpretation. Kentucky courts give text its plain meaning unless that would lead to an "unreasonable and absurd" result. *Executive Branch Ethics Comm'n v. Stephens*, 92 S.W.3d 69, 73 (Ky. 2002). "The words of the statute," the Kentucky Supreme Court has long held, "are to be given their plain meaning unless to do so would constitute an absurd result." *Id.*; *see Johnson v. Frankfort & Cincinnati R.R.*, 197 S.W.2d 432, 434 (Ky. 1946); *O'Daniel*, 153 S.W.3d at 819 (precluding consideration of extrinsic sources unless plain meaning "would produce an injustice or ridiculous result"). Kentucky's narrow exception is consistent with interpretive principles shared across court systems: "A provision may be either disregarded or judicially corrected as an error (when the correction is textually simple) if failing to do so would result in a disposition that no reasonable person could approve." ANTONIN SCALIA & BRYAN GARNER, READING LAW:

THE INTERPRETATION OF LEGAL TEXTS 234 (2012); *see generally* John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387 (2013).

Is it really absurd that the Kentucky General Assembly distinguished between gunpowder and compressed nitrogen? Sheard's argument depends on a version of a greater-includes-the-lesser assumption that the legislature's protection of the rights of employees to keep guns surely protects a wide variety of less-dangerous weapons—like tasers—not necessarily encompassed within the four corners of the statutes. But Sheard cites no law, nor makes any persuasive argument, in favor of this position. Brief in Opp. at 4 (citing nothing). To the contrary, courts and legislatures regularly distinguish between guns and other weapons. Congress passed the Firearms Owners' Protection Act, for example, which regulates guns but says nothing of other weapons like knives, num-chucks, or missiles. *See* Pub. L. 99-308, 100 Stat. 457 (1986). Sheard points to nothing indicating Congress's decision to address firearms to the exclusion of other weapons was an impermissible legislative choice. Or, for that matter, to any legal principle at all that would require legislatures to regulate categorically rather than step-by-step. *See, e.g., Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 489 (1955) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.").

To avoid absurdity, all courts must perceive is a *rational* reason for the usage suggested by the text. *Int'l Primate Protection League v. Admin'rs. of Tulane Ed. Fund.*, 500 U.S. 72, 84–85 (1991) (rejecting absurdity claim based on hypothesized policy concerns that would survive rationality review); *Chapman v. United States*, 500 U.S. 453, 465–66 (1991) (same). In enacting § 527.020(8), the General Assembly could've concluded that the likelihood or undesirability of local or private regulation of guns exceeded the risk of policies targeting tasers. That wouldn't have been absurd. Or perhaps the legislature simply didn't consider tasers at all. A less dangerous weapon might've reasonably been seen as less exposed to interference by employers, and therefore less worthy or needful of statutory protection. The statute right next to the one defining firearms, for example, protects the right to carry concealed *deadly weapons*, distinguishing and leaving unprotected (at least by this provision) any concomitant right to carry *non-deadly* weapons. KRS § 527.020. Even assuming the continuing legitimacy of this canon, *but see* Manning, 116 Harv. L. Rev. at 2390, this case would not present the vanishingly rare case in which a court might take a blue pencil to "absurd" statutory text rather than enforcing it as written.

**C. Deadly Weapon.** In the alternative, Sheard argues that even if a taser is not a "firearm," it is a "deadly weapon." KRS § 527.020(8). The Kentucky Court of Appeals has rejected this very argument. Tasers are not "deadly weapons," and "nothing … remotely indicates tasers are considered in any jurisdiction to be deadly weapons." *Blair v. Commonwealth of Kentucky*, No. 2005-ca-2017, 2007 WL 1720133, at *6 n.24 (Ky. Ct. App. June 15, 2007). For most, that non-lethality is the whole

point of using a taser instead of a gun. Decisions from many other jurisdictions have recognized this. Including the Sixth Circuit: in a "multitude of cases," "courts have held that the *use of non-deadly force*, such as … a taser, to subdue a defendant who is armed … does not amount to excessive force." *Thomas v. Plummer*, 489 F. App'x 116, 128 (6th Cir. 2012) (emphasis added; quotation marks omitted)); *see Fils v. City of Aventura*, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011) ("A 'taser' is a non-deadly weapon commonly carried by law enforcement.").

The dictionaries again provide back-up. *Black's* defines "deadly weapon" as "[a]ny firearm or other device … that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death." BLACK'S LAW DICTIONARY at 1827. *Webster's Second* defines "deadly" as "[c]ausing, or capable of causing, death; mortal; fatal destructive; certain or likely to cause death; as a *deadly* blow." WEBSTER'S SECOND at 674. And it defines "weapon" as "something to fight with; anything used or designed to be used, in destroying, defeating, or injuring, an enemy, as a gun, a sword, a shield." *Id.* at 2892. In other words, an instrument that isn't *designed* or *intended* (or certain or likely) to bring about *death* isn't a "deadly weapon."

No one can dispute that a taser is not designed to bring about death. Indeed, it's designed to *not* bring about death, while still allowing the user to temporarily arrest a target's movement. *See Cockrell*, 468 F. App'x at 492 n.3 (citing *Orsak v. Metro. Airports Comm. Airport Police Dept.*, 675 F. Supp. 2d 944, 951 n.2 (D. Minn. 2009)). When fired, a taser "transmits electrical pulses along the wires and into the body of the target." *Orsak*, 675 F. Supp. 2d 944, 957–58 (quoting *Oliver ex rel. Estate of Oliver v. Fiorino*, 586 F.3d 898, 903 (11th Cir. 2009)). These pulses cause "immobilization, disorientation, loss of balance, and weakness." *Id.* at 958 (quotation omitted). And when a taser is used in its normal and intended manner, it renders the targeted individual "incapacitated, disoriented, and unable to move," but not dead. *Id.* (quotation omitted).

Sheard shuns this logic and precedent in favor of an outlier extralegal source: "1000 people in the US," he asserts, "have died after police stunned them with tasers." Brief in Opp. at 5. Even accepting that figure (found nowhere in the pleadings or precedents presented to the Court) would not categorically transform tasers into deadly weapons. No more so, anyway, than it would an airbag, a peanut, a television set, or pharmaceuticals—all of which kill many people every year. That tasing causes some elevated risk of death does not mean the weapon is an instrument of death.

If we assume a taser could be a "deadly weapon" within the meaning of the statute, what about a hammer? Certainly it can and sometimes does cause death. *See* FBI UNIFORM CRIME REPORTING 2011 TABLE 11 (2011) (496 Americans killed by attackers wielding hammers and other blunt objects during 2011) (available at

7

https://ucr.fbi.gov/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/expanded-homicide-data-table-11). Obviously the likes of Black & Decker manufacture these tools to hammer nails, not to assail. But in Sheard's logic the intent of the designer or the weapon's wielder does not matter. To him, cars, hammers, and tasers are all "deadly" because "people … have died." Brief in Opp. at 5. That is not enough to sweep them within the statute's protections. Cars also kill many people, occasionally on purpose, and in such circumstances might even be considered a deadly weapon. *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("[A] car can be a deadly weapon."). Does that bring cars within the scope of the "deadly weapons" that employers and other organizations may not "prohibit … person[s] from … in a vehicle"? That understanding of the statute would be facially nonsensical and entirely inconsistent with the surrounding terms. *See Harper v. Univ. of Louisville*, 559 S.W.3d 796, 811 (Ky. 2018) (applying *ejusdem generis* canon to ambiguous statutory phrase). Because such a capacious definition runs contrary to dictionaries, caselaw, and common sense, the Court lacks any basis to presume the Kentucky Supreme Court would adopt it.

**\* \* \***

Under § 520.020(8), a taser is neither a firearm nor a deadly weapon.

### IV.

Although Novo has the better of that important debate, there's more to KRS § 527.020. According to Sheard, Novo fired him based on its mistaken belief that he possessed "a gun," rather than a taser, "in [his] car." FAC ¶¶ 11–14. Does Novo's mistake of fact about Sheard's weapon preclude civil liability for an *attempt* to violate the statute? The Kentucky Supreme Court has made clear that KRS § 527.020(8), consistent with its plan language, "authorizes a civil cause of action" "despite being part of the penal code." *Mitchell*, 366 S.W.3d at 902 (capitalization altered). The statute plainly states that what triggers liability is the "*attempt* … to violate the provisions of this subsection." KRS § 527.020(8) (emphasis added). This is what "may be the subject of an action for appropriate relief or for damages …." *Id.*; *see Mitchell*, 366 S.W.3d at 902.

The penal code's criminal-attempt provision likewise extends liability to one who "[i]ntentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be." KRS § 506.010(1)(a). That aligns with ordinary English usage; *Black's* defines "attempt" as "[t]he act or instance of making an effort to accomplish something, esp. without success." BLACK'S LAW DICTIONARY at 152; *accord* WEBSTER'S SECOND at 177 ("an unsuccessful effort"). And that is what Sheard alleges in his amended complaint: Novo told him that "he was being terminated for violating company policy" that disallowed an employee from "possess[ing] a gun in a vehicle." FAC ¶ 14. This is enough to state a plausible claim for a violation of KRS § 527.020(8).

8

The irony is obvious. Novo acted in response to gun possession, which is protected by state law though disallowed by company policy. But thanks to an apparent miscommunication, it responded to taser possession, which isn't protected by state law and (as far as we know) allowed by company policy. But this mistaken attempt does not obviously preclude liability. Certainly Novo hasn't yet pointed to any law or precedent that would override the statutory text. Based on the pleadings, therefore, Novo *attempted* to violate Sheard's rights under KRS § 527.020(8). So the Court cannot dismiss Sheard's second claim.

## V.

Finally, Sheard raises a wrongful-termination claim, alleging that his termination violated Kentucky's fundamental public policy. Kentucky law permits employers to discharge employees "for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983); *Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 198 (Ky. 2001) (same). A narrow "public-policy exception" to Kentucky's "terminable-at-will" doctrine, however, covers an employee's discharge "contrary to a fundamental and well-defined public policy as evidenced by existing" "constitutional or statutory" law. *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). A discharge contradicts public policy only when: (1) "explicit legislative statements prohibit[] the discharge," (2) "the alleged reason for the discharge … was the employee's failure or refusal to violate a law in the course of employment," or (3) "the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Mitchell*, 366 S.W.3d at 898 (quoting *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010)).

Importantly, even if the aggrieved employee falls within one of these three categories, he still must show that the public policy involved has an "employment-related nexus." *Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 652 (Ky. 2019). The Kentucky Supreme Court has explained this element's importance in marking the reach of the public-policy tort: "the concept of an employment-related nexus is critical to the creation of a 'clearly defined' and 'suitably controlled' cause of action for wrongful discharge." *Grzyb*, 700 S.W.2d at 402.

Sheard marshals an array of federal and state constitutional provisions and legislative enactments in support of his wrongful-termination argument. Beginning with the highest law, Sheard first cites the U.S. Constitution's Second Amendment and precedents interpreting it. These, he contends, embody a public policy that clearly protects his right to bear arms. *See* Brief in Opp. at 7–10 (citing, *e.g.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008)). But the Kentucky Supreme Court has rejected wrongful termination claims that rely on rights established in the Federal Constitution. The Bill of Rights, it explained, "proscribes only "governmental

transgressions" and does not "limit the employer's right to discharge an employee." *Grzyb*, 700 S.W.2d at 402. And the Second Amendment's text says nothing about whether an employer may terminate an employee for "keep[ing]" or "bear[ing]" arms. The lack of state action in this tort case renders the federal constitutional protection inapposite. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (dismissing constitutional claim for lack of state action); *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1933 (2019) (same).

Next, Sheard cites the Kentucky Constitution's protection of citizens' rights to "bear arms in defense of themselves and of the State." *See* Brief in Op. at 7 (citing KY. CONST. § 1.7). But this argument fails for the same reason the federal constitutional claim fails: Novo Nordisk is not the government, and no state actor violated Sheard's rights. *See Grzyb*, 700 S.W.2d at 402. "Kentucky courts have repeatedly held that § 1 [of the Kentucky Constitution] constrains the actions of the government alone." *Smith v. Norton Healthcare, Inc.*, No. 2014-ca-352, 2015 WL 5307705, at *2 (Ky. Ct. App. Sept. 11, 2015); *see Mendez v. Univ. of Ky. Bd. of Trustees*, 357 S.W.3d 534, 546 (Ky. Ct. App. 2011).

What about the Kentucky statutes Sheard's first and second claims rely on? As discussed above, KRS § 237.106 does not apply because its reach is geographically limited to vehicles "on the property" of an employer." But KRS § 527.020 applies to the facts as alleged, and the Kentucky Supreme Court has held it sufficient to satisfy the elements of a wrongful-termination tort.

In *Mitchell*, the Supreme Court considered a similar wrongful-discharge claim based on a violation of KRS § 527.020. Its opinion explained that the "General Assembly has expressed a strong public policy in favor of exempting a person's vehicle from restrictions on the possession of deadly weapons." 366 S.W.3d at 901. The statute permits any person to possess a firearm or other deadly weapon in his or her car and protects the weapon owner from retribution. *Id.* at 901–02 (quoting KRS § 527.020(8)). This represented "'a right conferred by well-established legislative enactment,'" and meant firing in violation of that right contravened Kentucky's public policy. *Mitchell*, 366 S.W.3d at 898, 903 (quoting *Hill*, 327 S.W.3d at 422). Although the opinion in *Mitchell* did not expressly mention the "employment-related nexus" discussed in other decisions, it did expressly discuss the interaction of Kentucky at-will and public-policy doctrines that gives rise to the nexus requirement. *Id.* (emphasizing the breadth of KRS § 527.020's application to "any person" who might interfere with gun possession in cars).

*Mitchell*'s holding applies with full force here. Sheard has pled that Novo wrongfully discharged him based on its belief that he possessed a firearm in his vehicle. FAC ¶ 14. Though Sheard's weapon—a taser—is neither a "firearm" nor "deadly weapon," KRS § 527.020(8) prohibits actual and attempted violations of the

statute. And that mistaken termination would appear to violate this substantive guarantee of Kentucky's code: it is "contrary to fundamental and well-defined public policy, i.e., the right to bear arms, as evidenced by existing statutory provisions, namely … KRS [§] 527.020." *Mitchell*, 366 S.W.3d at 903. So Sheard's third claim, for wrongful discharge, also survives Novo's motion to dismiss.

## ORDER

The Court grants in part and denies in part the motion to dismiss (DN 7).

Benjamin Beaton, District Judge
United States District Court

March 31, 2022

11